Good morning, Your Honors. May it please the Court, my name is Stacey Newman and I represent Mr. Banuelos. I'd like to reserve two minutes for rebuttal. In state court, Mr. Banuelos agreed to plead guilty with the understanding that the state would not recommend a sentence of life without the possibility of parole and with the understanding that he would be free to argue a sentence of 20 to 50 years. However, due to the ineffectiveness of his trial counsel, Mr. Banuelos' sentencing court was confused about those negotiations. The court mistakenly thought that Mr. Banuelos agreed that a sentence of 20 to life was appropriate. Unsurprisingly, the court then imposed that sentence, saying, quote, and this is at EOR 401, the court will follow the negotiations of the parties. The court will not impose the 20 to 50 requested by the defense, but will follow the parties' negotiations. Counsel, can I ask a question? It seems to me that there's a couple of different ways you could interpret that statement, I'll follow the negotiation of the parties. One is the parties had agreed that life without the possibility of parole would not be accepted. Why can't that be interpreted as, say, I'll follow the agreement of the parties and I'm not going to impose life without the possibility of parole? Your Honor, that is one way of interpreting it, but given that statement and the other statements that the court made, a more reasonable reading is that the court is confused. For example, at 396, this is at the beginning of the sentencing hearing, Mr. Banuelos' trial counsel tells the court, if you sentence my client to greater than 20 years to life, he can withdraw his plea. And the court says, I thought that was your negotiation. Well, he was confused about something else there, which was then straightened out, about a different thing, about which direction the withdrawal ran. But earlier at the plea colloquy, the court was perfectly clear. He said, this guilty plea memorandum is the defense is free to argue for the appropriate sentence, and the State will argue for the agreed or the stipulation.  That's correct. Correct, Your Honor. Yes. And that occurred about three months prior to this sentencing hearing. And that was perfectly lucid and perfectly accurate? Yes, Your Honor. That did occur at the guilty plea canvas. But later at the sentencing hearing, the court refers to the negotiation as 20 to life. And instead of the 20 to life, it was 20 to life. But what he meant all along was that that was the top, as opposed to what the probation officer was recommending. Right? In other words, the probation officer was recommending life, as I understand it. Your Honor, the probation officer was, yes, recommending life without responsibility. What he was referring to was that the party stipulation is it wouldn't be life. That is a possible interpretation of it. The other interpretation is that the court thought that everybody agreed this was a 20 to life case. This is a very brief sentencing, less than ten transcript pages. Mr. Ben Wallace's trial counsel didn't call any of the people in the court to testify. It all happened very quickly. And one inference that can be drawn is that the sentencing court was confused about this. In fact, they referred to the negotiations as 20 to life. And because there is a reasonable probability that the court is confused, that is enough under Strickland prejudice.  Sotomayor, as a shorthand, it was 20 to life, no more than 20 to life. That is one possible interpretation, Your Honor. The written — there was a written plea agreement submitted to the court, correct? Yes, Your Honor. There was a guilty plea memorandum that, when read as a whole, could support that Mr. Ben Wallace would be arguing for 20 to 50, but it never explicitly says that in the guilty plea memorandum. It just says that Mr. Ben Wallace will argue for, to quote, the appropriate sentence. It does not make it clear that Mr. Ben Wallace would be asking specifically for 20 to 50 years in that memorandum, nor does the sentencing memo say that. The sentencing memo that Mr. Ben Wallace's trial counsel submitted just said that Mr. Ben Wallace faced a sentence of 20 to life. It did not specify that he was going to be arguing for 20 to 50. It just said 20 to life. At the time of sentencing, the defense counsel said something to the effect that there really was no significant difference between life with the possibility of parole after 20 years or the alternative was 50 years with the possibility of parole after 20 years. Was there any real difference between those two? Yes, Your Honor. And, in fact — How does it — how? Counsel's statement probably added to the confusion of the Court's that he requested the sentence of 20 to 50 and then immediately backed away from it. But there is a great deal of difference between a sentence of 20 to 50 and a sentence of 20 to life, just at basic, the classification within the prison system, the chance that you have to expire and flatten that sentence. And, of course, if Mr. Ben Wallace reaches the year 50 of his sentence, it will mean a great deal to him. He faces the possibility of getting out of prison versus spending the rest of his life in prison. But he did say specifically, as a practical matter, probably makes not much difference, but it may make a difference as far as his classification within a department of prison. So he did say that. Yes, he did list that factor, but he didn't discuss all the other ways that a 20 to 50-year sentence is fundamentally different from an indeterminate 20 to life sentence. Well, he certainly didn't argue for it very vigorously, but that hasn't been your complaint, as I understand it. Yes, we had argued that below, but we did not receive a COA on that issue. So we are here arguing that the Court was confused and that trial counsel was ineffective for failing to correct the Court's confusion on that matter. Is it true that his sentence, because it's indefinite at this point, he cannot he's prohibited from being transferred to Mexico? Is that correct? Yes, Your Honor. Mr. Ben Wallace had reached out to the Mexican consulate to explore the idea of serving his sentence in Mexico. He received a letter back from them saying, sorry, we can't help because you have an indeterminate sentence. So that's another way that the 20 to 50-year sentence is fundamentally different. But isn't 20 to 50 still indeterminate? Your Honor, the Mexican consulate's position was because there was no definite end point and he faced a possibility of life that they could not go any further with that request. So it wasn't because it was indeterminate. It was because the end point was life? Is that what you're saying? They used the phrase indeterminate. But 20 to 50 years is indeterminate. But there's a difference between 20 to 50 and that 50, at least at the end of the 50, you know you're getting out. You're out at the end of 50. Exactly. Did you want to save some time for rebuttal? Yes, I wanted to save two minutes, but I still have some time, if that's okay. I wanted to discuss the procedural default briefly in this case. Now, below, the Court decided or, I'm sorry, assumed without deciding that the same things that established equitable tolling in Mr. Ben Wallace's case also supported cause. I just want to say that assumption is absolutely correct, and it's a similar analysis that the Supreme Court utilized in Maples v. Thomas, which is a 2012 case. In that case, the Supreme Court said that or, sorry, applied equitable tolling language from the case Hollanby, Florida, of extraordinary circumstances and found that the same things in that case, which was attorney abandonment, that justified equitable tolling also established cause. And that's exactly what happened in this case, Your Honors. So Mr. Ben Wallace has satisfied cause and prejudice for the default. And the basic asserted causes that he didn't speak English and there were no Spanish language materials in the prison library, is that basically it? There was a number of factors. One was the language barrier and the lack of Spanish materials. There was also Mr. Ben Wallace's placement into admin segregation for lengthy periods of times.  There was his placement into the workers' unit. That prevented him from going to the law library as much or as many times as he perhaps would have wished. So there are a number of factors, one, of course, yes, being the Spanish language  Roberts. Okay. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Amanda Sage with the Nevada Attorney General's Office. On behalf of the respondent appellees in this matter, I'd like to recognize from the beginning that we are dealing with a few different standards here as we evaluate the claims, the first being procedural default. Then we have the standards for the ineffective assistance of counsel claim. And then to a less or more indirect degree, the equitable tolling claim and whether the bearing on the ultimate issue in this case of cause under procedural default. However, while each of these are different, the Court doesn't need to decide those differences or really address them in order to reject this claim because the underlying ineffective assistance of counsel claim here lacks merit. Counsel, so are you suggesting we don't need to address the equitable tolling argument? Can we just assume? I believe that was what was done below, correct? They just assumed without deciding that the claim was proper and then said there's no prejudice here. Correct. The equitable tolling ruling was not part of the COA. The issue that comes up in the briefing is that because there was a basis for equitable tolling found by the district court that we should then assume that the Petitioner can establish cause under procedural default, that those two would be the same finding. They're different findings. Either way, it would be de novo review under this Court. So regardless of how the district court handled it, this Court would be free to review that question de novo under the procedural default. I hope that answered your question. It does. Okay. So moving into the ineffective assistance of counsel claim here, there are two large hurdles that the Petitioner would have to overcome to show that there would be any merit to this underlying ineffective assistance of counsel claim. First, they can't show that deficient performance at sentencing. First off, counsel achieved, I think, a pretty remarkable outcome here. The Petitioner was facing possible consecutive life sentences without the possibility of parole, so two consecutive life sentences because there was a weapons enhancement. He was able to negotiate that down to eliminate the weapons enhancement and allow so that the defendant would plead guilty and only face 20 to 50 on the low end or 20 to life. If the Court were to come in and sentence the defendant to the life without parole option, he'd be allowed to withdraw that plea and proceed to sentencing. So here, that was made quite clear to the Court. At the plea colloquy, the defendant's counsel got up and clearly explained the terms of the plea agreement, corrected any misconceptions the Court may have had. We then get to the actual sentencing where the Court, Judge Berry made very clear on the record she was very familiar with the case. She was familiar with the issues in the case, in part because this isn't just a case that just came before the Court once for an arraignment and then once again for sentencing. It was actually proceeding to trial. When he changed his plea, it was on for a confirmation of trial date. So she had heard some motions. She was very familiar with what was going on here. She would have had that guilty plea agreement in front of her again at sentencing and the terms of it. And when she expressed, when she directly expressed confusion, defense counsel did what reasonable counsel should do, got up and clarified that confusion. To say that they should have done more, that there was some suggestion that there was any other confusion, I think kind of places an unreasonable standard of what happens at sentencing. So sentencings happen pretty quickly. Now, we're sitting here and picking apart the judge's words after hours of analysis and being able to, like, break it down and compare. That doesn't happen at sentencing. The counsel is up. Things are happening quickly. When there was a question about what the negotiations were, he clarified it. Otherwise, he proceeded as normal and asked for 20 to 50 years. No one objected to that. But if there was any confusion, the Court would have brought that to everyone's attention. Certainly, the State would have set up and said, well, hold on, that's not our negotiations. That didn't happen. And anyone that sat through a number of sentencing in trial courts know that it's pretty common for the sentencing court at the end to say, I'm going to follow the negotiations, indicating here, I think, the reasonable interpretation, meaning I'm not going to impose that life without parole that probation, parole and probation wanted her to impose. I'm going to stick with the negotiations and impose that 20 to life. So I don't think we can show deficient performance based on what counsel did at sentencing, especially when you take into consideration the arguments that he made for the 20 to 50 life, the mitigation package that he put together for the court, bringing the defendant's family to the court and bringing that to the attention of the court at sentencing. Then we have to get to the prejudice prong. So I don't think we can show deficient performance. That alone is enough to deny this entire claim and affirm the district court. And, counsel, maybe this is leading into where you're going, but let's assume there was some misunderstanding. What is our burden as a court to determine what the district court would have done? I mean, if we find that there was misunderstanding, is that enough? And we say we've got to send it back down and have the district court redo this? Or is there still a hurdle to say there's really no reasonable fact scenario here where the district court would have done 20 to 50 and so that's enough? I think that actually kind of touches on deficient performance and prejudice because even if we were to say the court had a misunderstanding, we'd still have to find that counsel was objectively unreasonable in not catching that misunderstanding, not correcting it given how the sentencing proceeding had gone forward. So we'd still have to make that deficient finding. Then going into prejudice, I think that in this case it presents kind of an how we view that reasonable probability of a different outcome in trial. So I know there were cases cited by Petitioner that talked about, for example, Glover, that talked about where sentencing counsel's actions resulted in a greater sentence and that was enough to show prejudice. But in cases like Glover and the other case, Tillich, that they talked about, what sentencing counsel's actions did is prevented the defendant from receiving an otherwise sentence that he was entitled to. So in Glover, there was a miscalculation of the offender score that affected the range he was facing at sentencing. Had counsel stepped in and corrected that offender score, the defendant would have been entitled to that lower sentence. In Tillich, I think there was a conviction in the defendant's history that or was showing up in the defendant's history, at least, that qualified him as a habitual offender and exposed him to that greater sentence that he received. Had counsel stepped up and said that's actually invalid, that's not part of his criminal history, then he would have been entitled to the lower sentence. He would not have been sentenced as a habitual offender. Here, the defendant received a sentence that he pled to, that he agreed to as part of the negotiation. So I think it would present an odd standard to say that when a defendant comes forward, agrees to guilt for the crime, and says, I agree that I'm going to expose myself either to the 20 to 50 or 20 to life, and has been sentenced pursuant to those prejudices by counsel that chance. Kagan. I mean, that seems difficult. I mean, suppose it was quite clear that the district judge thought that they had agreed to the 20 to life and never suggested that there had been any argument to the contrary. How does one know what would have happened if he understood the right, what was correct? I mean, I don't — the ultimate question is whether the outcome, you know, I guess it's a — well, it's the Strickland standard, which is, is there a reasonable probability that he might have done otherwise? And I don't know how we could say there isn't if, in fact, hypothetically, he had been really confused about whether there was another option. And I agree. I don't think that we can come in here and say that there is a reasonable probability he would have received anything else. So when you look at the facts of the case — So I don't understand your argument, then. If you really thought this was a problem, then it seems to me there would be prejudice. There wouldn't be prejudice because you still have to show a reasonable probability of that different outcome. And since we don't know what the counselor or what the court would have done here, there can't be that reasonable probability. Why not? There's no certainty. Strickland is a high standard. So if we're going to show — Oh, it's not a high standard when you have a situation where — it's a high standard, but if it's — if there are two options and the judge didn't understand that there were two options, why isn't there a reasonable probability he would have chosen the other option? Because we can look to what the information was before the judge. So she heard all of the information. And any, I think, reasonable judge in this situation — this isn't a case where, you know, there was a fight that escalated and there was a killing. This was a planned, calculated killing where he lured the victim into a position, didn't even try to get the money that he was ostensibly trying to get from the victim, shot the victim as he tried to flee. I mean, under those situations, when you have that and you have — I mean, the real truth is, and this is why, you know, when harmless error slash Strickland prejudice breaks status, we have no idea. That's true. We don't. And I don't think having no idea should be a basis for sending everything back to the court. I think we need to rely on that record and look at some of those facts. Well, when there's a constitutional violation, we have no idea is a pretty good basis for the fact that there's a problem. But I don't know that we — I don't think we're going to get there. But nonetheless, it's an interesting problem. And the point at which a counterfactual hypothetical about which is what all prejudice is becomes insupportable, essentially. I certainly agree. It's an interesting problem. This presents sort of an interesting case in how we treat a sentence where he was sentenced to something lawful that he could have had and that the alternate sentence also was lawful. It's not — we're not dealing with, like, an illegal sentence or anything else. So it does present an interesting question. Well, plus, if I were you, I would argue in addition that the judge could have given that sentence if he wanted to. Could have. Whether anybody agreed to it or not. Correct. He could have gone above, and then we'd be — probably would have been proceeding to trial on the double play. He could have gone below, too. Even if he thought the agreement was 20 to life, he still could have gotten 20 to 50,  Could have. The judge always has discretion to do that. But of course, as I stated at the beginning, we don't have to get to that point. The Court has no further questions. Thank you. Thank you, Your Honors. Just a couple of things, Your Honors. In response to counsel's argument that just because Mr. Van Wells received a lawful sentence that there could be no prejudice, the Court in Glover did not decide whether there was an error in calculation. It sent it back for consideration. And also, this Court in Lafleur found ineffective assistance of counsel where the defendant received an otherwise lawful sentence, but it was still worse than what they might have received. And second of all, there is a reasonable probability of a different outcome here because Mr. Van Wells was a good candidate for 20 to 50 years. He had a very minor criminal history. He had only two nonviolent misdemeanor convictions. And as evidenced by the 34 letters of support he received from friends, family, employers, by all accounts prior to this incident, Mr. Van Wells was a hardworking, caring family man, and this was completely out of character and most likely brought about by substance abuse issues, specifically methamphetamines. But all of that evidence that you just referenced, that was all before the district court, correct? Yes, Your Honor. And one more thing we just wanted to point out. We're not attacking the underlying decision on whether to plead guilty. It's simply counsel's performance at sentencing, which here was defective performance. It was ineffective. Okay. The court has no more questions. Thank you. Thank you, Your Honor. We'll submit it. Thank you, counsel. The next case on the calendar was Medina Ramirez v. Whitaker, but that's been we've deferred submission of that case. So we'll just go to the next one, which is Herrera Zumiez.
judges: Paez, Berzon, Nelson